UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LUTHERAN HOMES, INC., <br> d/b/a Lutheran Life Villages, <br><br> Plaintiff, <br><br> v. <br><br> LOCK REALTY CORPORATION IX, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 1:14-CV-102 JD <br> ) <br> ) <br> ) <br> ) |

## **OPINION AND ORDER**

Now before the Court are various matters that need to be resolved in advance of the trial in this case, including the scope of issues to be tried, the parties' motions in limine, and objections to expert testimony. As discussed in the Court's order granting summary judgment, this dispute arises over a contract for the transfer of Medicaid certification rights for beds in Indiana nursing facilities. The State of Indiana requires a bed to be certified in its Medicaid program in order to fully reimburse a facility for services provided to the bed's occupant. At the time the parties entered the agreement at issue, the State had a statutory moratorium on granting new certifications, but it permitted facilities to transfer their existing certification rights amongst themselves. The plaintiff, Lutheran Homes, Inc., which had a surplus of certified beds, agreed to sell the certification rights for 35 of its beds to the defendant, Lock Realty Corporation IX, for the price of $350,000.

However, the moratorium contained a sunset provision, and between the time the contract was entered and when the closing was set to take place, it became apparent that the legislature would not act to extend the moratorium. Lock Realty thus refused to pay for and accept transfer of Lutheran Homes' certification rights, deciding to instead wait and seek them from the State at

no cost. In response, Lutheran Homes filed this action for breach of contract. The Court has already granted a motion for partial summary judgment in Lutheran Homes' favor as to liability, and though the parties dispute the precise scope of that order, the only remaining issues relate to the measure of damages to which Lutheran Homes is entitled.

**A.     Issues to be Tried**

The first question that needs to be resolved is what issues remain to be tried following summary judgment, and the legal contours of those issues. Lutheran Homes argues that the only remaining issue is Lock Realty's affirmative defense of failure to mitigate, as it contends that the order granting summary judgment in its favor established both that Lock Realty is liable for breach of contract and that Lutheran Homes' damages prior to the affirmative defense of mitigation are $350,000, the purchase price under the contract. Lock Realty disagrees, arguing that the summary judgment order determined only that it breached the contract and that it had no affirmative defense against liability.

The Court agrees with Lock Realty's interpretation of the Court's order granting summary judgment. Lutheran Homes' motion was a "motion for partial summary judgment" in which it sought summary judgment "on all claims and defenses asserted in this action, with the exception of Lock Realty's affirmative defense of failure to mitigate damages." [DE 19]. Its brief in support of summary judgment only discussed Lock Realty's affirmative defenses against liability, and contained no analysis or discussion as to the measure of its damages should Lock Realty be found liable. Further, while Lutheran Homes submitted evidence that the purchase price was $350,000 and that Lock Realty refused to pay that price, it did not submit any evidence that it had not thereafter sold or derived value from using the certifications, for example, which would reduce the damages to which it was entitled. In its response, Lock Realty in turn confined

its arguments to its affirmative defenses to liability. The Court's order did likewise, and did not address the amount of any damages.

In its conclusion, the Court's order stated, "Lutheran Homes' motion for summary judgment [DE 19] is GRANTED in full, meaning as to all claims and defenses asserted in this action with the exception of Lock Realty's affirmative defense of failure to mitigate damages. All that remains to be decided is the measure of Lutheran Homes' damages." [DE 28 p. 11]. Lutheran Homes argues that by granting summary judgment on its claim, the Court was necessarily awarding Lutheran Homes all the relief that its complaint sought on that claim. However, granting a party judgment on a claim does not necessarily mean that the Court is awarding the entire relief a party seeks on that claim, particularly in the case of monetary damages, which parties typically must submit admissible evidence to prove up. And without any discussion from either of the parties on the measure of Lutheran Homes' damages, the Court had no occasion to decide that issue on summary judgment. Thus, by stating that the motion was granted "in full," the Court was not holding that Lutheran Homes had proved its damages as a particular amount prior to mitigation, but only that the Court ruled in Lutheran Homes' favor on every issue actually raised in the motion. In any event, there is little use for further parsing the Court's order: given the lack of any meaningful discussion on this issue in either the parties' filings or the Court's order on summary judgment, it would be appropriate to re-open that issue if it had been decided in the first place. Accordingly, the Court does not find that the measure of Lutheran Homes' damages prior to mitigation has already been established, so that particular issue remains in play.

That said, Lock Realty's pre-trial filings reflect a fundamental misunderstanding as to how Lutheran Homes' damages will be calculated. For example, Lock Realty argues that

3

Lutheran Homes suffered no damages as a result of the breach because Lutheran Homes paid nothing to acquire the rights and its tax basis in the rights was zero. It also notes that Lutheran Homes agreed to sell certification rights to another party for a lower price after the moratorium expired. Thus, Lock Realty intends to argue that Lutheran Homes' damages are minimal because the rights are not actually worth $350,000. Those arguments are nonsense. Upon a breach of contract, the non-breaching party is entitled to the amount of damages that will put it in the same position it would have been in "if the contract had not been broken." *Fischer v. Heymann*, 12 N.E.3d 867, 871 (Ind. 2014). In other words, the point of comparison is the position the non-breaching party would have been in had there been *no breach*, not the position it would have been in had there been *no contract*.[1] Ind. Model Civil Jury Instructions, No. 3313 (2014) (stating that the measure of damages for breach of contract is the amount that would put the plaintiff "in the same position it would have been in *had the contract been fulfilled*" (emphasis added)). It is undisputed here that Lock Realty agreed in the contract to pay Lutheran Homes $350,000, so it is wholly irrelevant whether Lutheran Homes paid anything to acquire the certifications or whether they were actually worth that amount. Had there been no breach, Lutheran Homes would have received $350,000, so that is the starting point for measuring Lutheran Homes' damages.

The only remaining question would be whether Lutheran Homes' damages should be reduced from that amount because it retained the certification rights after the breach.[2] A party may not receive damages that would place it "in a better position than [it] would have been if the

---

[1] Counsel stated at the final pretrial conference that a party cannot receive a windfall "because of a contract," but that is not accurate—the law is that a party cannot receive a windfall because *of a breach* of a contract. *Sheek v. Mark A. Morin Logging, Inc.*, 993 N.E.2d 280, 289 (Ind. Ct. App. 2013) ("[A] party injured by a breach of contract may not be placed in a better position than it would have enjoyed *if the breach* had not occurred.").

[2] Notably, in that context, Lock Realty's argument that the certifications were worth nothing cuts in the exact opposite direction.

contract had not been broken." *Fischer*, 12 N.E.3d at 871. Had there been no breach, Lutheran Homes would have been paid $350,000, but it would not have still had the 35 certification rights. Thus, Lutheran Homes would not be entitled to recover the entire $350,000 if it was also able to benefit from not having had to transfer the certification rights to Lock Realty, such as by selling them to another party or using them in its own facility, for example. *Four Seasons Mfg. Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007) ("Where a party does mitigate its damages, the breaching party is entitled to set off the amount of damages mitigated."). However, the parties agree that Lutheran Homes has not actually sold any of the certification rights, and there is no suggestion that it has actually used any of them in its facility, so Lutheran Homes' damages will not be reduced on either of those bases.[3]

The only other basis on which to reduce Lutheran Homes' damages below $350,000, then, would be the argument that as of the date of trial, Lutheran Homes will still have the certification rights and could potentially realize value from them in the future by selling them or using them in its facility. Both of those possibilities are problematic for multiple reasons, though. First, the parties agree that Indiana has now enacted a ban on the transfer of Medicaid certification rights, so Lutheran Homes has no present ability to sell any of the 35 certifications. It would be entirely speculative to consider whether Indiana might subsequently repeal that ban or allow it to expire, or what Lutheran Homes might be able to sell the certifications for at that time. Thus, it does not appear that damages can be reduced on that basis, either.

As to whether Lutheran Homes could use the certification rights to generate revenue in its facility in the future, which Lock Realty mentioned in its supplemental brief, that is also

---

[3] Any argument that Lutheran Homes should have done these things but didn't would go to Lock Realty's affirmative defense, not to Lutheran Homes' damages in the first instance, which are based on the damages it actually sustained.

5

speculative. First, it appears that Lutheran Homes has no intent of using the rights in its facility. Because the certification rights do not generate any revenue unless they are used, they are worthless to Lutheran Homes if it is not using and does not intend to use them. Any argument that Lutheran Homes *should* use the certification rights even though it does not intend to would be based on a duty to mitigate damages, and thus would be part of Lock Realty's affirmative defense, not Lutheran Homes' proof of its actual damages. In addition, the Court is not aware of any evidence that Lutheran Homes would be able to generate revenue from the certifications even if it wanted to, or in what amount, so there does not appear to be any basis on which a jury could conclude that the certifications have a present value to Lutheran Homes based on the possibility of their future use. In short, it appears that whatever value the certification rights may have had to Lutheran Homes was extinguished once Indiana banned the transfer of these certifications,[4] meaning that Lutheran Homes will not be in a better position due to Lock Realty's breach due to the fact that it still has the certifications at present.

Last, the Court notes that in its supplemental brief, Lutheran Homes argued that Lock Realty previously promised not to assert any new defenses based on Lutheran Homes' reinstatement of the certifications after Lock Realty refused to go through with the transfer that the State had already approved. The parties addressed that argument briefly and somewhat hastily in their supplemental filings given the then-impending trial date, so the Court does not resolve that issue here. However, because for all of the above reasons, it appears that the measure of Lutheran Homes' damages may be suitable for resolution as a matter of law, and because Lutheran Homes was under the mistaken impression that it had already received summary

---

[4] In fact, Lock Realty's own CEO described these rights as "a 'perishable commodity' whose 'shelf life' might soon expire" if the state banned their transfer. [DE 26-2 ¶ 5].

judgment in its favor on that issue, the Court believes that it is appropriate to permit Lutheran Homes to file a new motion for summary judgment as to the measure of its damages prior to any failure-to-mitigate defense. The Court will therefore grant Lutheran Homes leave to do so, and once that motion has been resolved, the Court will reset the trial date.

**B.     Lock Realty's Motions in Limine**

Lock Realty filed two motions in limine. The first seeks to bar Lutheran Homes from using the "car hypothetical" it outlined in its objection to Mr. Fritz's testimony. The second motion objects to the submission of the question of pre-judgment interest to the jury. Lutheran Homes does not oppose either motion, so the Court GRANTS both of Lock Realty's motions in limine. [DE 57]

**C.     Lutheran Homes' Motions in Limine**

Lutheran Homes' motion includes the following five motions. [DE 61]. Because the first two are related, the Court addresses them together.

**1&2     Evidence pre-dating the breach or relating to the legislature's unexpected failure to extend the moratorium**

Lutheran Homes' first motion in limine seeks to exclude evidence relating to events occurring prior to Lock Realty's breach. Its second motion seeks to exclude evidence of the Indiana legislature's unexpected failure to extend the moratorium, or that its failure to do so rendered the certification rights worthless or justified Lock Realty's breach. Lutheran Homes argues that this evidence would be irrelevant to the remaining issues and would instead be offered to attempt to justify or excuse Lock Realty's breach and appeal to the jury's sympathy. In response, Lock Realty argues that evidence falling in these categories is relevant to provide context for the parties' transaction and resulting dispute, and is also relevant to its mitigation defense, in that Lutheran Homes was required to use such diligence as would be exercised by a

reasonably prudent person under similar circumstances, and this evidence goes to what the circumstances were and how a reasonably prudent person would have confronted them. Lock Realty also states, though, that it intends on explaining why it decided not pay the purchase price under the contract.

The Court agrees with Lock Realty that this evidence has at least a limited purpose, and therefore denies the motion. At least some of these facts may be appropriate so that the jury can understand the background and context for the contract and the dispute. Such evidence could also help explain the market for certification rights that existed after the breach, which is central to the mitigation defense. Likewise, the volatility of the legislature's action with regard to the moratorium and its contemplated ban on transfers in 2014 could affect the way in which a reasonable party would act in light of pending legislation in 2015. In fact, Mr. Decker states in his report that Lutheran Homes reasonably requested a substantial down payment from any potential purchaser in light of "the uncertainty of the actions of the Indiana General Assembly."

However, the Court agrees with Lutheran Homes that the extent of evidence that should be admitted for those purposes is very limited, and that it is not appropriate for Lock Realty to attempt to explain why it decided to breach the contract or that it viewed the certification rights as worthless. The Court has already held that Lock Realty breached the contract; why Lock Realty did so is not relevant to any of the remaining issues. Any attempt to explain why it breached the contract would simply be an appeal to the jury's sympathies and to jury nullification. Lock Realty argues that the jury should understand that it had a rationale and did not breach the contract for no reason, but whether Lock Realty had a good reason for breaching the contract has no impact on the amount of damages that should be awarded, which is the only issue the jury is being asked to decide. Lock Realty also notes that its CEO will be one of its

witnesses, and that the jury may discount his credibility if he is viewed as someone who has breached a contract. But to the extent the reason for breaching his contract would impact his credibility, the prejudicial impact of this evidence would substantially outweigh its probative value. Further, the preliminary statement that the parties have agreed to be read to the jury already states that Lock Realty refused to pay for the certifications after the moratorium expired and it realized it could receive them from the State at no cost. Thus, the jury will not get the impression that he breached the contract for an arbitrary or deceitful reason. Further emphasizing that fact through witness testimony would be unnecessary and prejudicial.

### 3. Evidence of Lutheran Homes' contract to sell certification rights to the Ketcham Center

Lutheran Homes next seeks to exclude evidence of a transaction it entered with the Bertha D. Garten Ketcham Memorial Center. Around the same time as it entered the contract underlying this case with Lock Realty, Lutheran Homes entered a similar contract to exchange 11 certification rights with the Ketcham Center in exchange for $200,000. After it became apparent that the moratorium was going to expire, the parties reduced the total purchase price to $35,000. Lutheran Homes wants to exclude this evidence as irrelevant. Lock Realty wants to offer this to show that the certification rights were not actually worth the $350,000 it agreed to pay in the contract, and to argue that it therefore should not have to pay Lutheran Homes that amount in the first instance.[5] Since that argument is frivolous for the reasons explained above, the Court GRANTS this motion, and excludes evidence of Lutheran Homes' sale of certification rights to the Ketcham Center.

---

[5] Lock Realty stated at the final pretrial conference that it does not wish to offer this evidence relative to its mitigation defense, so the Court does not consider its admissibility for that purpose, but would note that a compromised purchase price reached to resolve a potential dispute has little probative value of the fair market value of those rights.

### 4. Opinions that Lutheran Homes or Robert Decker failed to use reasonable diligence to mitigate damages

Lutheran Homes next moves to bar any of Lock Realty's witnesses from offering opinions that Lutheran Homes or Robert Decker failed to use reasonable diligence to mitigate its damages. Lutheran Homes specifically refers to any testimony from Mr. Fritz, Lock Realty's retained valuation expert, and Mr. Centers, Lock Realty's CEO. As to Mr. Fritz, Lock Realty confirmed at the final pretrial conference that he will offer no such opinion, so the motion is moot as to him. As to Mr. Centers, Lock Realty expects to elicit testimony from him on the various ways in which he believes Lutheran Homes and Mr. Decker failed to use reasonable diligence to sell the certification rights. Lutheran Homes argues in opposition that Mr. Centers is not "qualified" to offer those opinions because he has never sold a certification right or used a broker to do so. However, even if Mr. Centers has not sold certification rights, he has bought them and he has experience in the industry, so he likely has knowledge about what reasonable efforts to sell the certification rights might have entailed. In addition, Lutheran Homes does not identify any authority upon which it raises this objection. Objections to witnesses' qualifications for offering opinions would typically arise under Rule 702, but Lutheran Homes does not cite that rule, nor did it file the motion in limine by the deadline for objecting to expert testimony. Meanwhile, Rule 701, which applies to opinion testimony by lay witnesses, and on which Lock Realty relies, does not require the witness to have any particular qualifications. Thus, the Court DENIES this motion in limine at this time, but notes that Lock Realty will need to lay the appropriate foundation at trial for Mr. Centers' personal knowledge of these matters before he offers these opinions.

### 5. The consulting agreement between Lutheran Homes and Robert Decker

Finally, Lutheran Homes moves to exclude evidence relative to an error in the consulting agreement by which Lutheran Homes retained Robert Decker as a broker to sell the certifications after Lock Realty's breach. The name of Mr. Decker's company is "Lucas Health Group, Inc." but the agreement refers to the company once as "Lucas Health *Care* Group, Inc." and once as "Lucas *Healthcare* Group, Inc." Lock Realty argues that this is probative of Mr. Decker's diligence since he failed to even notice that the agreement mis-named his company, and thus suggests that he failed to use reasonable diligence in attempting to sell the certification rights. Lutheran Homes argues that this evidence is irrelevant and prejudicial. The Court agrees with Lutheran Homes. The presence of these minor errors in the consulting agreement says basically nothing about whether Lutheran Homes exercised the requisite diligence in mitigating its damages, which is the pertinent issue. Further, permitting this evidence would be to invite a trial within a trial as to the degree of diligence Mr. Decker exercised as to all sorts of minutiae bearing little connection to the issues actually in dispute, and would thus needlessly delay trial. Therefore, to the extent the evidence has any relevance in the first place, the Court would exclude it under Rule 403, so this motion is GRANTED.

### D. Objections to Expert Testimony

#### 1. Lock Realty's Objection to Robert Decker's Testimony

Lock Realty objects to certain opinions offered by Mr. Decker relative to his and Lutheran Homes' efforts to sell the certification rights. As just discussed, Mr. Decker is a broker whom Lutheran Homes retained to sell the certification rights following Lock Realty's breach. He will testify as a fact witness about his involvement in that process, and that aspect of his testimony is not in dispute. However, Lutheran Homes has also disclosed him as an expert witness, and produced an expert report in which Mr. Decker expresses five opinions:

(1) Lutheran Homes acted reasonably in hiring him as a broker; (2) the timing of his engagement by Lutheran Homes did not adversely affect Lutheran Homes' ability to obtain a buyer for the rights; (3) the efforts he undertook on behalf of Lutheran Homes to attempt to sell the rights were reasonable; (4) Lutheran Homes acted reasonably in connection with his efforts to sell the rights (including by refusing to sell to a competitor and by seeking to sell all 35 rights in a single transaction instead of piecemeal); and (5) Mr. Fritz did not correctly value the rights in his report. Lock Realty objects to the first four opinions on the basis that Mr. Decker did not base his opinions on a reliable methodology, as required by Rule 702.[6]

To begin with, Lock Realty's objection that Mr. Decker cannot offer these opinions on the reasonableness of his and Lutheran Homes' efforts is odd given that Lock Realty expressly argues that its own witness, Mr. Centers, can offer reciprocal opinions on the exact same topics as a lay witness. DE 65 p. 10 ("Lutheran suggests that only an expert can opine on the reasonableness of Lutheran's actions for the purposes of the mitigation of damages claim. This is simply not true."). Lock Realty cannot argue, on the one hand, that its own witness can offer these opinions under Rule 701 as a lay witness and, on the other hand, that Lutheran Homes' witness's equivalent testimony should be excluded because it does not meet Rule 702's standards for expert testimony. Lock Realty also agreed at the final pretrial conference that Mr. Decker is in a position to offer lay opinions on these topics.

Lock Realty's objection thus appears to be less aimed at whether this testimony is admissible, and more concerned with labeling this as "expert" testimony, which could cause the

---

[6] Lock Realty's briefing appeared to object at least in part to Mr. Decker's fifth conclusion, which responded to Mr. Fritz's opinion on the fair market value of the certification rights, though counsel stated at the final pretrial conference that Lock Realty does not seek to exclude that conclusion.

12

jury to attach more weight to Mr. Decker's opinions as compared to Mr. Centers' opinions. However, the Court does not formally designate any witness as an expert to the jury, so it is not clear how that label would come to be attached to Mr. Decker's testimony. Moreover, Mr. Decker's qualifications and experience will be admissible whether he testifies as an expert or not, since those facts go to whether it was reasonable for Lutheran Homes to hire him as a broker, so characterizing him as a lay or expert witness makes no difference in that regard, either.[7] *See United States v. Moreland*, 703 F.3d 976, 983–84 (7th Cir. 2012) (holding that the distinction between the witness' lay and expert testimony was immaterial where the witness' experience would have been admissible either way, and noting that "[u]sing terms like 'lay witness' and 'expert witness' and trying to explain to the jury the difference between the two types of witness is inessential and, it seems to us, ill advised"). Furthermore, the jury will be instructed that it should judge the testimony of expert witnesses in the same way that it judges the testimony of any other witness. [DE 72 p. 14].

The only practical difference Lock Realty has identified that would result from characterizing Mr. Decker's opinions as expert testimony is that Lutheran Homes wishes to introduce his prepared report into evidence as an exhibit. On that topic, Lock Realty likewise wishes to introduce Mr. Fritz's expert report as an exhibit. However, the Court sees no reason why either of those reports should be admitted into evidence. Both of those witnesses will testify at trial in person, and can fully present their opinions and the reasons for those opinions to the jury through their testimony, without also needing to provide those same opinions to the jury in written form. Nothing in either report appears to have any evidentiary or demonstrative value of

---

[7] Similarly, as Lutheran Homes points out, Lock Realty does not challenge Mr. Decker's expert status insofar as he responds to Mr. Fritz's opinions, so he will testify as an expert regardless at least to that extent.

its own. Thus, unless either party can provide the Court with a good reason for why those reports should be admitted and provided to the jury, the Court does not intend to allow their introduction as evidence, in which case Lock Realty's objection would seem to be moot.

Even assuming that Mr. Decker's testimony qualifies as expert testimony, though, the Court would still overrule Lock Realty's objection. A court has a gatekeeping function under *Daubert* to "'ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). (quoting *Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007)). Lock Realty objects to Mr. Decker's opinions primarily on the basis that he did not use a sufficiently reliable methodology to reach those opinions. However, "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education." *Id.* (quoting Fed. R. Evid. 702). "Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Id.* (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)); *see also Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (noting that "'because there are many different kinds of experts, and many different kinds of expertise,' the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors" (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

In *Metavante*, for example, the issue in dispute was whether a party's performance under the contract was "commercially reasonable." 619 F.3d at 761. The plaintiff retained an expert with experience in the relevant industry. *Id.* The expert testified based on his experience as to

14

what was considered reasonable in the industry, and then testified that the plaintiff's performance had met that standard. *Id.* Because the expert adequately explained how his experience in the industry led him to the opinions he offered, the Seventh Circuit held that the testimony satisfied Rule 702's reliability threshold. *Id.* at 761–62; *see also Lees*, 714 F.3d at 524–25 (holding that an expert could testify to the applicable standard of care in an industry based on his experience in that industry and his investigation into relevant facts, and that such a methodology "fit[] the factual and legal context of this case," even though it was not scientific and did not easily admit of rigorous testing and replication).

Here, Mr. Decker is qualified based on his experience in the industry, and he similarly explains how his experience in and knowledge of the industry leads him to each of his conclusions. For example, he discusses his knowledge of the modest occupancy rates of nursing facilities in Indiana and in Allen County and the competitive advantage that certification rights offered to facilities, and opines on that basis that it was reasonable for Lutheran Homes to decline to sell the certification rights to any nearby facilities against which it might have to compete for patients. He also discusses how, based on his knowledge of the industry and the remaining market for certification rights, he was able to identify potential purchasers and contact them directly, whereas mass mailings would have been unlikely to have reached decision-makers who were in the market for the rights, which led to his conclusion that it was reasonable for him to proceed in the manner that he did. And as to valuation, to the extent that opinion is at issue, Mr. Decker discusses his knowledge of the dynamics of the industry and the way in which the parties' relationship may affect the price at which they would exchange certification rights in light of those dynamics, leading to his opinion that one of the transactions might not have represented the market value of the rights. Therefore, because Mr. Decker was qualified based on

15

his experience in the field and adequately traced his reasoning from that experience to his conclusions, the absence of a formal, scientific methodology does not justify the exclusion of his testimony.

Lock Realty further objects on the basis that Mr. Decker's testimony would be unduly partisan given that he would be opining at least in part on the reasonableness of his own actions. The Court disagrees that such an objection goes to admissibility, though. Mr. Decker's opinions relative to his own actions are helpful and relevant because they help place those actions in the context of the industry in question and show how those actions could be considered reasonable under the circumstances, which is an element of Lock Realty's affirmative defense. Because Mr. Decker has a unique knowledge of what he did and why, and will be testifying to those facts regardless, it is appropriate for him to offer an opinion as to how those actions were reasonable, too. Lock Realty can cross-examine Mr. Decker on his self-interest, but that self-interest is not so extreme as to render his opinions irrelevant, and the jury is capable of evaluating that factor and assessing Mr. Decker's opinions accordingly. *Promega Corp. v. Applied Biosystems, LLC*, No. 13-cv-2333, 2013 WL 9988881, at *3 (N.D. Ill. May 28, 2013) (Posner, J., sitting by designation) ("[The defendant] further argues that [the expert witness] is biased because he has a stake in the suit's outcome as an employee and shareholder of [the plaintiff], but this is an issue that a jury can understand and give the proper weight to."). Accordingly, the Court denies Lock Realty's motion to exclude Mr. Decker's expert testimony.

### 2. Lutheran Homes' Objection to Alexander Fritz's Testimony

Finally, Lutheran Homes objects to the testimony of Alexander Fritz, a certified valuation analyst whom Lock Realty retained to offer an opinion on the fair market value of the certification rights. Mr. Fritz opined that the certification rights had a fair market value—defined as the price at which property would change hands between hypothetical willing buyers and

sellers—of $10,000 per bed as of September 30, 2014, and $12,500 per bed as of April 30, 2015. Lutheran Homes objects to this testimony only on the ground that it is irrelevant,[8] arguing that because Mr. Fritz cannot say whether any willing buyers actually existed, his testimony about the price at which a willing buyer would purchase the certification rights is irrelevant.

The Court does not agree. As Lutheran Homes' filings observe, Lock Realty will have to prove as part of its affirmative defense: (1) that Lutheran Homes failed to use reasonable diligence to mitigate its damages, and (2) the amount of any damages that Lutheran Homes failed to mitigate. *Fischer*, 12 N.E.3d at 871. In these circumstances, the latter element will require Lock Realty to show, first, that Lutheran Homes could have sold the certification rights had it used reasonable diligence, and second, the price at which that sale would have occurred. Mr. Fritz's testimony is directly relevant to that latter question, as the fair market value of the certification rights is probative of the price at which such a transaction would have closed. The fact that Lock Realty will still have to prove through other evidence that a willing buyer existed does not make this evidence irrelevant.

Lutheran Homes' objection also appears premised on its assumption that Lock Realty intends to argue that damages should automatically be reduced by the fair market value of the certification rights if it establishes that Lutheran Homes failed to exercise reasonable diligence. Lutheran Homes is correct that such an argument would not be an accurate statement of the law, but the Court does not interpret Lock Realty's response as making that argument. *E.g.*, DE 64 p. 3 ("If the jury decides that . . . Lutheran did not act reasonably in attempting to mitigate damages, the jury has to decide the amount of damages that Lutheran could have avoided had it

---

[8] At the final pretrial conference and in its reply brief, Lutheran Homes questioned Mr. Fritz's methodology, but because its opening brief does not object on reliability grounds or even mention Rule 702, the Court considers any objection on that basis to be waived.

17

acted reasonably. This is where Mr. Fritz's opinion becomes highly relevant."); p. 4 ("If Lock can demonstrate that there were parties in the market to buy Bed Rights, . . . then the fair market value of the Bed Rights is relevant to the jury's determination of the reduction of damages."). To the extent Lock Realty presents an improper argument at trial, Lutheran Homes may raise an appropriate objection, but Mr. Fritz's testimony is clearly relevant for a permissible purpose, so the Court overrules Lutheran Homes' objection.

**E.     Conclusion**

The Court GRANTS Lock Realty's motions in limine [DE 57] and GRANTS in part and DENIES in part Lutheran Homes' motions in limine [DE 61]. The Court DENIES the motion to exclude Mr. Decker's expert testimony [DE 46] and OVERRULES the objection to Mr. Fritz's testimony [DE 53]. The Court GRANTS Lutheran Homes until January 6, 2016 to file a motion for summary judgment as to the measure of its damages prior to any failure-to-mitigate affirmative defense.

SO ORDERED.

ENTERED: December 7, 2015

/s/ JON E. DEGUILIO
Judge
United States District Court